## THE MARGARET J. SANFORD.*

### PARTRIDGE v. THE MARGARET J. SANFORD.

*(District Court, S. D. New York. May 1, 1886.)*

1. COLLISION— SHIPS— CANALS— ENTRANCE OBSTRUCTED— PROJECTING BOATS— CONTRIBUTORY FAULT.

The interests of navigation require that the entrances to slips, or to narrow passages that are public thoroughfares, be kept free from obstructions that make the passage dangerous. Vessels that moor so as to allow parts of their hulls to project partly across such passages, so as to make entrance difficult, will be held chargeable with contributory negligence in case of collision.

*For opinion on appeal to circuit court, see 37 Fed. 148.

2. CASE STATED—EAST RIVER—HUNTER'S POINT CANAL.

The tug M. J. S., with a car-float 180 feet long and 30 feet wide in tow along-side, bound for Hunter's Point Canal, 157 feet wide, on approaching it in the ebb-tide, found the entrance obstructed by vessels projecting partly across it from above and from below, making the entrance difficult and dangerous in the ebb. Instead of waiting for slack water, or getting additional help, she pushed on slowly, and run into the bow of the ship T., which encroached some 15 or 16 feet upon the entrance. *Held* both in fault,—the tug for keeping on in the face of known danger; the T., for unjustifiably obstructing the entrance.

In Admiralty.

*Butler, Stillman & Hubbard* and *Wm. Mynderse*, for libelant.
*Benedict, Taft & Benedict*, for claimants.

BROWN, J.    About noon of March 24, 1885, the steam-tug Margaret J. Sanford, having in tow along-side a float loaded with railroad cars, went up the East river, bound for the Empire Oil-yard docks, at Hunter's Point.    The docks are approached by what is called a "canal," 157 feet wide, running inland at right angles with the river.    Above the canal a bulk-head extends some 600 feet along the East river, used by heavy draught vessels.    At this time the British vessel Tantallon was lying along the bulk-head, loading with oil, her bows projecting some 15 or 16 feet beyond the corner of the bulk-head, partly across the line of the canal.    The opposite bank of the canal extends some 95 feet further to the westward into the river, and from that point a bulk-head runs down river, along which, at this time, another vessel was moored, whose stem projected up river some 30 feet, across the line of the canal, and her bowsprit some 30 feet more.    The railroad float was about 180 feet long by 30 feet wide, and was on the port side of the tug, which was about 80 feet long by 18 feet wide, the sterns of the two being about in line.    The proofs show that this was the best mode of lashing, and that the pilot directed the navigation from the pilot-house, which was also the safest and most proper place for him.    The tide was ebb; the day pleasant.    On approaching the canal, observing the obstructions, the pilot hailed the Tantallon when about 30 feet distant, and desired to tie up along-side of her.    He was answered by a man from the wharf that he must not do so, but should come into the canal.    In attempting to go into the canal, the port corner of the float struck the Tantallon's starboard side, some eight or ten feet from the stem, and broke two iron plates and one frame, which were repaired at an expense of $700.94. The damages were near the water-line, and the loading of the vessel was suspended to repair them, as was stated, for seven days.    The libel was filed to recover the damage for the repairs, and an equal amount for the delay.

1. From the facts described, as well as from other evidence at the trial, I must hold that, upon the ebb-tide, with a cumbersome float, it was neither prudent nor reasonably safe to attempt to go into the canal at that time, while there were such obstructions to the entrance.    This seems to have been understood and appreciated from the first; and this makes the tug legally chargeable with fault for making the attempt.

Perils of the seas cover only such dangers as remain after the exercise of ordinary prudence in avoiding dangers, not risks that are voluntarily entered upon when the undertaking is seen to be not reasonably safe. Vessels desiring to land or to go into slips, if they would avoid liability for incurring such risks, are bound to wait for slack water, as the Sanford in this case might have done, or for other means of help, or until the obstructions are removed. The tug in this case was certainly not in any such situation *in extremis* as compelled her to enter the canal in spite of the obstructions. The inconvenience of waiting for slack water, or of obtaining other help, is not to be compared with the dangers or the injuries likely to arise from pushing on, in spite of evident special dangers.

2. I cannot hold vessels lying, like the Tantallon, with their bows projecting across the entrance of slips, or the entrance of a narrow canal frequented by other craft, free from fault. Such projections are obstructions to rightful navigation in thoroughfares designed to be kept open, where, without any obstructions, there is none too much room for reasonable navigation. This passage was much used for floats of this description. The tug and float were consigned to the dock within this canal. They had a right to go there, and not to be kept unreasonably waiting for safe means of entrance. The interests of navigation require that such entrances should be kept open, and that encroachments that make the passage dangerous should be held wrongful on the part of projecting vessels, as respects other vessels bound in or out. The owner of the dock located this steamer, it is said, as she was placed; but he also directed this tug and tow to proceed up the passage. It does not appear that the canal was private property. I must assume it to be a public thoroughfare, which no vessel had a right to obstruct. The fact that the owner of the dock requested the vessel to go there is no defense to her, though that might make him also liable; nor does his direction to the tug to come into the canal excuse the tug. As between the two vessels, the direction given to either is no defense to the other. There was plenty of time and opportunity for the steamer to have been moved back and away from the canal after the vessels astern of her had gone away, and before the tug arrived; and, so far as appears, the vessel's remaining up to that time, with her bows projecting over the canal, was without valid excuse, as well as wrongful.

In the case of *The Canima*, 17 Fed. Rep. 271, the projecting vessel was held, on appeal, not chargeable with damages, on the sole ground, as I understand the opinion, that the other vessel had no business to be in the place where the collision occurred; otherwise it is intimated the damages would have been divided. In the present case the canal or dock was the place where the tug was bound, and where she had a right to go. The approach was narrow. The Tantallon had no right to be where she was, so as to obstruct the canal. She owed to every vessel bound in or out the duty of allowing an unimpeded passage. Both must therefore be held chargeable with fault contributing to the injury. *The Baltic*, 2 Ben. 452.

I allow the libelant $750 for one-half the damages, unless a reference be desired, which either party may take, if wished. The costs are also divided. My decision was arrived at before the application by the libelant to take the additional deposition, and has not been influenced by it.