THE CROWN OF GALICIA. THE M. MORAN. THE HELEN B. MORAN.

(District Court, E. D. New York. October 16, 1914.)

Collision ⊂⊃71(2)—Dry Dock in Tow—Collision with Steamship at Pier.

    A section of a dry dock, being towed into the Erie Basin by two tugs, came into collision with the stern of the steamship Crown of Galicia, which was lying alongside a pier just inside the Basin, with a part of her stern extending beyond the line of the entrance gap. She was where she was placed by those in charge of the Basin, which is private property. *Held*, that she was not in fault for her position, nor because, being without motive power at the time, she did not move out of danger, but, on the evidence, that the two tugs were in fault for not maneuvering with proper care and skill; the position of the steamship being obvious.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ⊂⊃71(2).]

In Admiralty. Suit for collision by Harry Cossey against the steamship Crown of Galicia, the Crown Steamship Company, Limited, claimant, and the tugs M. Moran and Helen B. Moran, the Moran Towing & Transportation Company, claimant, with cross-libel by the Crown Steamship Company against the tugs, Dry Dock Section No. 6, Harry Cossey, claimant, and others. Decrees in favor of libelant and cross-libelant against the two tugs, but modified on motion.

Affirmed on appeal, 232 Fed. 305, —— C. C. A. ——.

William J. Martin and George V. A. McCloskey, both of New York City, for libelant.

Samuel Park, of New York City, for claimant.

Kirlin, Woolsey & Hickox, of New York City, for the Crown of Galicia.

Haight, Sandford & Smith, of New York City, for Gans S. S. Line.

Ralph James M. Bullowa, of New York City, for trustees Beard and Robinson.

CHATFIELD, District Judge. The Erie Basin is a private property, used for wharfage purposes by vessels placed, at the direction of the owners of the property, in berths numbered and designated upon maps of the property according to location and size. The entrance is called the Gap, and is shown by the testimony to be 196 feet in width, between substantially parallel walls. The wall upon the north side is about one-third the length of that upon the south side, and the relative shape and location can be seen best from the following diagram:

The steamship Crown of Galicia was taken into the dock by a competent pilot, upon the 23d day of November, 1913, and moored alongside the portion of the dock marked in the diagram. Some conflict of testimony was presented as to whether the owners of the basin were given the exact dimensions of the steamer before assigning her a berth, or whether the consignees and agents of the steamer made due inquiry as to the size of the berth. But a determination of this question would seem to make no difference, for the steamer evidently used the berth without protest, and occupied such a position with respect to that berth that the entire issue rests between the steamer herself and the tugs which later attempted the maneuver causing the accident.

The testimony indicates that the steamer was about 400 feet long, and was attached by the usual fore and aft lines to that portion of the dock which is marked as 384 feet in length. At the place marked "Sulphur Works," a fence runs across the pier or bulkhead, and the steamer was not taken further down the dock, as the lessees of the sulphur works property needed their pier front for the unloading of lighters. The officers of the steamship, the pilot, and some of the other witnesses, testify that the steamer was lying broadside against the

dock, with her stern substantially even with a line drawn at right angles to the extreme end of the pier face. As the steamer was 52 feet wide, it is evident that from a point near the middle of the outer side of the Gap, a person entering would see substantially the whole of the stern of the steamer and much of her starboard counter, and whether she were a few feet further ahead or astern would make no substantial difference to any ordinary craft coming in the Gap. The testimony indicates that after the accident the Crown of Galicia was moved somewhat further ahead, so as to be entirely within the projection of the side wall of the Gap. But these movements of themselves are not proof of negligence in the position of the steamship before the accident and are rather matters of precaution for the sake of the steamship itself.

It will be noticed that to the northeast, Pier A, inside the basin, again narrows the space for vessels entering around the south wall of the Gap, leaving but 260 feet between this pier and the corner at which the stern of the Crown of Galicia was lying. On the day in question, certain lighters and small vessels were moored around and alongside Pier A, so that the entire space of 260 feet was not available for purposes of navigation, when two tugs, the M. Moran and the Helen B. Moran, brought up to the Gap a section of a floating dry dock which, when entering, came in collision with the stern of the Crown of Galicia and caused the damage which is the basis of this action.

The dry dock was to be assembled within the basin, by the fastening together of a number of parts substantially alike in size and shape, and of which four had been previously towed into the basin by these two tugs. This section was 125 feet over all (in the dimension which would be the width of the entire dry dock) and 80 feet over all (across the particular section). On each end of this section was the usual high wall to form a part of the sides of the dry dock, and bitts were located upon the *deck* of the section (the floor of the dry dock) near the side walls and near the edges of the section. The parts of this dry dock had been towed from Staten Island, and upon the voyage in question the tug stopped outside of the gap while the Helen Moran went in and caused the movement of certain lighters, so as to give space to maneuver on the side of the Gap toward Pier A.

The Helen B. Moran saw the Crown of Galicia, but did not cause her to be moved, nor did the Helen B. Moran entirely free the space on the north side, or over to Pier A, but apparently made sure only of an opening as wide as the Gap itself; that is, at least 196 feet of clearance between the Crown of Galicia and the boats upon the north. Meantime the M. Moran attached a hawser to the forward one of the bitts on the port side of the deck of the section, and placed the Helen B. Moran, upon her return along the opposite side of the section, to act as an auxiliary tug in handling the tow. Signals had to be transmitted from the M. Moran to the Helen B. Moran by a deckhand upon the floor of the dry dock, and the Helen B. Moran seems to have properly obeyed orders and attempted to assist, to the extent of her ability, in all subsequent maneuvers.

It is apparent that the method of towing adopted would cause the dry dock to move forward cornerwise, with the 80-foot dimension of the section (from which the dry dock side wall projected upward) extending back to port from the tug, and the long (or cross dry dock side of the section) extending backward to starboard from the tug. When a pull was exerted in a straight line, the corner of the section would move forward parallel to the line of the hawser, but a few feet to port, and if the direction of the section was not changed, by any side strain upon the hawser, nor by the wind, nor by the tide, the section of the dry dock would move steadily.

The testimony indicates that this method of towing, after momentum had been obtained, produces less yawing and allows easier control of the object towed by the helping tug than when a bridle is used, and when a broad forward surface is presented to the resistance of the water. But the method of towing adopted necessarily presents the disadvantages incident to lack of rigidity or fixed control of the object towed (except as the helping tug may take the object entirely in its charge and direct its motion) if the strain upon the towing hawser cannot overcome any tendency to move in a direction not desired or dangerous to the tow.

The testimony of all the witnesses is that the two tugs proceeded safely with the dry dock through the narrow portion of the Gap forming the entrance proper, until the tug M. Moran reached a point between the stern of the Crown of Galicia and Pier A. Up to this time the tug had maintained a straight course. The destination of the dry dock was to the south or to the starboard, and it was necessary for her to make a turn around the stern of the Crown of Galicia before reaching the vicinity of the boats upon the north side of the Gap off Pier A.

At this point all of the witnesses observed a tendency on the part of the dry dock to swing in toward the stern of the Crown of Galicia. The captain of the M. Moran testifies that it was from some gust of wind or current influence which he could not anticipate or observe, and there is no evidence that the helping tug affected the direction of movement of the dry dock until the captain of the M. Moran put his own helm to port and signaled to the helping tug to also turn the dry dock to the south, in order to twist the rear end of the section, as it moved through the water, toward the north and away from the Crown of Galicia.

It would seem to be entirely immaterial whether some sudden motion upon the part of the dry dock caused the captain of the M. Moran to undertake this maneuver, or whether the beginning of the movement was caused by the course of the M. Moran to the starboard, in order to work around into the basin, upon the natural course to reach its destination. The result of the maneuver would be exactly the same. The force of the helping tug would turn the dry dock, but would not move the dock bodily to the north and away from the Crown of Galicia, even if the Helen B. Moran could by herself move the section, so long as both tugs were under a port helm, and so long as the strain upon the towing hawser prevented it from so doing. The towing hawser would

by the change of course swing the dry dock with some pivotal motion around a center, but would also, with any substantial length of hawser, move the entire section ahead and to the south in exactly the direction in which the captain of the M. Moran did not wish the dock to go, because of the presence of the stern of the Crown of Galicia.

The inevitable result followed. The dock continued to move forward toward the Crown of Galicia and came in contact with her stern. The accident could have been prevented only by taking the dry dock sufficiently to the north or toward Pier A, so as to keep her clear of the Crown of Galicia, which was in plain sight of the M. Moran during all the maneuvers inside the Gap, and to the Helen B. Moran when estimating the amount of space necessary to bring the dock in. The fact that the Crown of Galicia was left without motive power, or that her crew did not succeed in getting her out of the way, may throw some light upon what might have been done if circumstances had been different to save her from the danger which was impending; but no fault or negligence can be imputed to the owners of a vessel, who did not successfully snatch her from destruction, because they might have succeeded in so doing if they had known of the dangers which others were going to put her in.

The present case is not similar to that of The Margaret J. Sanford (D. C.) 30 Fed. 714, where a public channel was being blocked in such a way as to form a trap to vessels which had the right to anticipate that the path was entirely unobstructed. The Erie Basin is not a public highway of that nature, and the mere presence of the Crown of Galicia in such a location as to use a part of the entrance to the Gap would not be negligence to any one who was not misled, or who was able to avoid danger by the proper exercise of care on his part. Success in bringing in the previous sections of the dry dock furnishes no excuse for carelessness with respect to the handling of the fifth section, and the case must be determined from the particular circumstances shown in this particular voyage.

The tug M. Moran must be held responsible for the accident. The tug Helen B. Moran seems to have been at fault through failure to warn the M. Moran of the presence of the Crown of Galicia, even after estimating how much room the M. Moran would need to make the turn, and knowing that it could not be accomplished unless the M. Moran kept far over to Pier A and understood properly the danger from the Crown of Galicia. This would seem to be sufficient negligence to hold the Helen B. Moran for a share in the fault.

The Crown of Galicia has alleged fault against the dry dock, has brought in by petition the Gans Steamship Company (which in turn has brought in the Beard Estate), and has raised a number of issues which should be decided (as between the steamship and those parties) against the steamship. But this in turn was occasioned by the act of the libelant, Cossey, who alleged fault against the steamship as well as against the tugs. No costs will therefore be awarded the steamship or the owner of the dry dock as against each other; but the libel against the steamship Crown of Galicia, and the cross-libel against the dry dock, will be dismissed, and the petition of the steamship against the

Gans Line, and of the Gans Line against the Beard Estate, will also be dismissed, without costs.

The libelant, Cossey, may have a decree against the tug M. Moran and the tug Helen B. Moran, with costs, including the expense of taking testimony with respect to the issue against the tugs.

### On Motion to Modify.

The steamship Crown of Galicia in the cross-libel claimed damages, the items of which were set forth in the depositions filed. One of the witnesses appearing upon the trial testified that the only damage actually suffered by the steamship was the mar in the paint shown by the photograph introduced in evidence. Upon the argument of the case and in the briefs the court acted under the mistaken assumption that the testimony of this witness was correct and that the steamship intended to waive any claim for actual damage.

The opinion previously filed was rendered upon this mistaken assumption by the court, and application has been made by the Crown of Galicia for a decree in its favor against the dry dock with respect to such damage as may be proven. Upon the representations of counsel that they intend to show items of damage substantial enough to justify the entry of a decree, the court will modify the opinion previously rendered to the extent of granting an interlocutory decree in favor of the Crown of Galicia against the tugs, if upon a reference or by stipulation any substantial damage be shown, and will also reserve any modification of the allowance of costs which might properly follow such a change in the decree.